UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHANIEL GILBERT,

    Petitioner,

v.                                CASE NO. 09-11223
                                   HONORABLE MARK A. GOLDSMITH

PATRICIA BARNHART,

    Respondent.
_____/

**OPINION AND ORDER
DENYING THE HABEAS CORPUS PETITION,
DENYING A CERTIFICATE OF APPEALABILITY, and
GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS**

**I. INTRODUCTION**

Petitioner Nathaniel Gilbert, a state prisoner at the Thumb Correctional Facility in Lapeer, Michigan, has filed a pro se habeas corpus petition pursuant to 28 U.S.C. § 2254. The habeas petition challenges Petitioner's Macomb County conviction for first-degree (felony) murder. Petitioner was sentenced to mandatory life imprisonment without the possibility of parole. He alleges that: (1) the evidence was insufficient to support his conviction, (2) the trial court abused its discretion by admitting in evidence a photograph of the victim as she appeared when her body was discovered; and (3) the trial court reversibly erred by denying his motion for mistrial after the deceased victim's mother had an emotional breakdown and collapsed in the courtroom. Respondent urges the Court to deny the petition on grounds that the state court's decision on Petitioner's first claim was objectively reasonable and the second and third habeas claims are not cognizable.

The Court agrees that the state appellate court's adjudication of Petitioner's first claim was

not unreasonable and that Petitioner's second claim is not cognizable on habeas review. The Court also finds that the emotional outburst by the victim's mother did not deprive Petitioner of a fair trial. Accordingly, the habeas petition will be denied.

## II. BACKGROUND

Petitioner was charged in Macomb County, Michigan with first-degree murder and third-degree criminal sexual conduct. The charges arose from allegations that Petitioner raped and killed a fourteen-year-old girl on November 17 or 18, 2005. The victim was fourteen years old at the time of her death. She was living with her mother and two sisters in an apartment in Warren, Michigan. Petitioner lived with his mother in the same apartment building.

The testimony at trial established that the victim's mother went to work on the day in question and left the victim at home with her two sisters, Onyette and Dream. Later that evening, the victim talked with Onyette, Petitioner, and Onyette's friend, Allen Doyle, in the hallway outside Petitioner's apartment. At about 10:30 p.m., Onyette left the building. At the time, the victim was sitting on the steps next to Petitioner's apartment. Petitioner subsequently went inside his apartment, and the victim went to her apartment where she and Mr. Doyle talked until 11:30 p.m. Mr. Doyle then left.

Neighbors saw the victim go to Petitioner's apartment, and Onyette testified that the victim called her at about 11:30 p.m. She assumed that the victim was calling from Petitioner's apartment because his name and number appeared on Onyette's cell phone. The victim sounded fine on the telephone, but when Onyette returned home shortly after midnight, she was unable to find the victim. She called Petitioner several times and went to his apartment a few times. The third time she went there, Petitioner answered the door, but he ushered her out the door and said that he had

2

not seen the victim. Onyette testified that, a few days earlier, Petitioner had told her that he was craving sex, and he wondered whether Onyette had any friends she could invite over. He also said that the victim acted as though she was afraid of sex.

The victim's mother arrived home about 12:30 a.m. on November 18, 2005. Upon being informed that her daughter was missing, she went to Petitioner's apartment. Petitioner informed her that the victim had been at his place for a minute, but left. The police were called, and an officer who responded to the call spoke to Petitioner briefly. The officer found Petitioner to be very calm and nonchalant. Nothing about Petitioner's behavior raised his suspicions.

About twelve hours later, the victim's grandmother and uncle discovered the victim's body near a dumpster in the apartment complex where she lived. Her body was cold and she was unresponsive. She was naked, except for socks on her feet and a bra and sweater, which were pulled up above her breasts.

Petitioner initially informed the uncle that the victim had been at his apartment, used his telephone, and left with someone else. After the uncle found the victim's body, he questioned Petitioner again and encouraged Petitioner to say something if he knew anything. Petitioner responded, "Okay. I'll tell . . . ." Their conversation was interrupted before Petitioner could finish his statement.

A police officer found a pair of wet, sand-colored pants in a plastic garbage bag in Petitioner's apartment. Another police officer testified that there were no signs of a struggle in Petitioner's apartment, and a nurse testified that the only injury she detected on Petitioner during a head-to-toe examination of him was a one-centimeter abrasion on his upper lip.

A forensic scientist for the Michigan State Police testified that she identified Petitioner's

DNA in the sperm portion of a rectal swab taken from the victim. It was such a rarity for a person to match the evidence on the rectal swab (one in 184.9 trillion) that the scientist stated she would expect only one person to match the evidence.

A forensic nurse examiner testified that the victim had nine abrasions on her anus. The Chief Medical Examiner for Macomb County testified about blunt force injuries to the victim's face, neck, and genital area and a post-mortem injury to her right flank, which was consistent with her body scraping the edge of the dumpster. There were no injuries to the victim's scalp, skull, or brain and no defensive injuries on her hands. The medical examiner concluded from all the evidence, including ligature marks on the victim's neck, that the cause of death was strangulation and that the manner of death was homicide.

A detective testified that he interviewed Petitioner on November 18, 2005. During the interview, Petitioner stated that he had spent some time with the victim, her sister, and Allen Doyle but that he last spoke with the victim about 11:44 p.m. on November 17. He claimed that he went to the victim's apartment to tell her that Onyette had called him and asked him to inform the victim and Mr. Doyle that Doyle could go home because Onyette would not be coming home for a while. Petitioner stated that he went back to his apartment after delivering this message and went to sleep.

The detective conducted a second interview with Petitioner after Petitioner's apartment was searched and after Onyette identified the pants found in Petitioner's apartment as being the ones the victim was wearing when Onyette last saw her. Upon being told that the victim's pants were found in his apartment, Petitioner put his head down, sobbed for a moment or two, and said that he did not mean for this to happen. After he gained his composure, he informed the detective that the victim had come to his apartment after Mr. Doyle left the building and that the two of them mutually agreed

to have sex. He said that they moved into the bathroom where they began to engage in vaginal sex. At some point, the victim got on the floor and placed her hands on the bathtub. Petitioner claimed that he grabbed her from behind, lifted her leg, and performed anal sex on her. He lost his balance, fell backwards, and pulled the victim away from the tub, causing her to strike her head on the tub and become unconscious. When someone knocked on the door, he picked up the victim and slid her face down into the bathtub, which was full of water from earlier in the evening. He ran to the door, looked in the peephole, and saw no one. Then he ran back to the bathroom and tried to remove the victim from the tub.

At this point in the interview, the detective informed Petitioner that the autopsy had revealed evidence of a ligature being used on the victim's body. Petitioner then changed his story again and said that, when removing the victim from the tub, his hands went around her neck as he tried to set her upright in the bathroom.

Toward the end of the interview, Petitioner said that, when he placed the victim in the tub the first time, her body jerked and when he pulled her out of the tub, her body quivered and she made a noise. He admitted that he choked the victim until she stopped breathing and made no more sounds. He explained to the police that he had not wanted to hurt the victim, but he was afraid that, if she lived, she would tell other people that he had tried to kill her. He stated that he had carried the body out the front window and tried to place her in the dumpster. He was unsuccessful and dragged her around to the other side of the dumpster where he left her.

Petitioner did not testify at trial or present any witnesses. Defense counsel argued to the jury that the sex act was consensual and that the prosecutor had failed to prove the homicide was linked to criminal sexual conduct. Defense counsel maintained that, at most, Petitioner was guilty of

5

second-degree murder.

The trial court instructed the jury on first- and second-degree murder and third-degree criminal sexual conduct. On August 25, 2006, the circuit court jury found Petitioner guilty, as charged, of first-degree murder, Mich. Comp. Laws § 750.316(1)(b) (murder committed during the commission or attempt to commit a felony), and third-degree criminal sexual conduct, Mich. Comp. Laws § 750.520d(1)(a) (sexual penetration of a person who is thirteen, fourteen, or fifteen years of age). At the sentencing on September 26, 2006, the prosecutor moved to dismiss the criminal sexual conduct charge on double jeopardy grounds. The trial court granted the motion and sentenced Petitioner to life imprisonment for the murder conviction.

Petitioner raised his habeas claims in an appeal of right. The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished, per curiam opinion. People v. Gilbert, No. 273644 (Mich. Ct. App. Dec. 20, 2007). On April 28, 2008, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. People v. Gilbert, 747 N.W.2d 284 (Mich. 2008).

Petitioner filed his habeas corpus petition on April 2, 2009. His claims are:

I. Michigan's felony murder rule requires additional mens rea besides intent to commit the underlying felony. There was insufficient evidence that Defendant possessed the required state of mind for a conviction for felony murder.

II. The trial court abused its discretion and deprived defendant of his rights to due process of law and a fair trial in allowing a photograph to be admitted when the probative value was outweighed by its unfair prejudice.

III. The trial court reversibly erred and denied Defendant of his right to a fair trial in denying Defendant's motion for mistrial as a result of the collapse and emotional breakdown of the deceased's mother during trial.

6

### III. STANDARD OF REVIEW

A state prisoner is entitled to the writ of habeas corpus only if the state court's adjudication of his claims on the merits

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. "[W]here factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct." Goodwin v. Johnson, 632 F.3d 301, 308 (6th Cir. 2011) (citing 28 U.S.C. § 2254(e)(1) and Landrum v. Mitchell, 625 F.3d 905, 914 (6th Cir. 2010)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011). To obtain a writ of habeas corpus from a federal court, a petitioner must show that the state court's decision "was so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

## IV.  DISCUSSION

### A.  Sufficiency of the Evidence

Petitioner alleges that there was insufficient evidence at trial to establish that he possessed the required state of mind to be found guilty of felony murder. According to Petitioner, there was no evidence of malice, and one could infer from the evidence that there was no struggle and no aggression or intent to harm the victim following the sex act. The Michigan Court of Appeals adjudicated Petitioner's claim on the merits and concluded that the evidence was sufficient for a reasonable trier of fact to determine that the death occurred during the perpetration of a felony and that Petitioner possessed the required intent.

#### 1.  Clearly Established Federal Law

As stated by the Sixth Circuit:

> a conviction with insufficient evidence violates the defendant's federal due process rights. To determine whether sufficient evidence supports a particular conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

White v. Steele, 602 F.3d 707, 709 (6th Cir. 2009) (quoting Jackson v. Virginia, 443 U.S. 307, 316 (1979)) (citation omitted).

8

"[A]fter AEDPA, federal courts reviewing state habeas claims accord a double layer of deference" to sufficiency-of-the-evidence claims. Id. at 710. First, the court must determine whether "an rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Brown v. Konteh, 567 F.3d 191, 205 (6th Cir. 2009) (emphasis in original), cert. denied,130 S. Ct. 1081 (2010). Second, if the court were to conclude that a rational trier of fact could not have found the petitioner guilty beyond a reasonable doubt, the court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." Id. (citing 28 U.S.C. § 2254(d)(2)) (emphasis omitted).

The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. Petitioner was charged with felony murder. The elements of that offense are (1) the killing of a human being, (2) with malice, (3) while committing, attempting to commit, or assisting in the commission of specified felonies. People v. Carines, 597 N.W.2d 130, 136 (Mich. 1999) (quoting People v. Turner, 540 N.W.2d 728, 732 (Mich. Ct. App. 1995)).

The underlying felony in this case was third-degree criminal sexual conduct, which is one of the felonies enumerated in the felony murder statute. See Mich. Comp. Laws § 750.316(1)(b). As applied to this case, the prosecutor had to prove that sexual penetration occurred with a person who was at least thirteen years of age, but less than sixteen years of age. See Mich. Comp. Laws § 750.520d(1)(a).

### 2. Application

It was undisputed that the victim was fourteen years of age at the time of her death and that Petitioner killed her. Additionally, Petitioner admitted to the police that he had anal sex with the

victim. The presence of his DNA evidence on the victim's rectal swab confined that anal penetration occurred. Thus, the elements of criminal sexual conduct, as defined in § 750.520d(1)(a), were satisfied.

Petitioner's statement to the police established that the sexual activity occurred at the time of the victim's death. It was not necessary for the prosecutor to show that the murder was contemporaneous with the enumerated felony. People v. Kelly, 588 N.W.2d 480, 488 (Mich. Ct. App. 1998) (citing People v. Brannon, 486 N.W.2d 83, 85 (Mich. Ct. App. 1992)). "The statute requires only that the defendant intended to commit the underlying felony at the time the homicide occurred." Id. at 488-89.

The murder occurred in the same location as the sexual activity and during the same period of time. Further, Petitioner has not specified an intervening event that broke the sequence of events leading from the sexual activity to the murder. The jury could have inferred that the murder was part of an unbroken chain of events involving criminal sexual conduct and that Petitioner was guilty of killing the victim while committing a felony. The jury was free to reject Petitioner's theory that the murder was not associated with the sex acts. See Jackson, 443 U.S. at 319 and 326 (stating that the Jackson "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony " and declining to adopt "a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt").

The main element in dispute is Petitioner's intent. The prosecutor had to prove that Petitioner acted with malice, which, in felony murder cases is "the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." People v. Kelly, 588 N.W.2d at 488.

Petitioner informed the police that he choked the victim until she stopped making any sounds and stopped breathing. And the medical examiner testified that it would take four to five minutes of continuous pressure to result in death by asphyxiation. The medical examiner also testified that the victim's death was the result of purposeful action, not an accidental strangulation. He opined that any reasonable person would know that such conduct was harmful and likely fatal. (Tr. Aug. 24, 2006, at 84, 105-06, 114.)

A rational trier of fact could have concluded from the evidence, taken in the light most favorable to the prosecution, that Petitioner possessed the intent to kill or the intent to do great bodily harm. At a minimum, a rational trier of fact could have concluded that Petitioner created a high risk of death or great bodily harm by choking the victim and that he knew death or great bodily harm was the probable result. Consequently, the evidence was sufficient to sustain Petitioner's conviction, and the state appellate court's adjudication of his claim was objectively reasonable. Petitioner is not entitled to habeas relief on the basis of his sufficiency-of-the-evidence claim.

### B. The Admission of a Photograph of the Deceased Victim

Petitioner alleges next that the trial court abused its discretion and deprived him of due process and a fair trial by allowing the prosecutor to admit a photograph of the deceased victim as she was found after her death. Petitioner claims that the photograph was unnecessary, that it served no useful purpose, and that it likely evoked feelings of sympathy and anger in the jurors and caused them to be prejudiced against him.

The Michigan Court of Appeals adjudicated this claim on the merits and stated that the risk of unfair prejudice inherent in the nature of the photograph did not substantially outweigh its probative value. The Court of Appeals concluded that the trial court did not abuse its discretion

11

when it admitted the photograph.

### 1. Clearly Established Federal Law

The Supreme Court stated in Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." "As a result, 'errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus.'" Sanborn v. Parker, 629 F.3d 554, 575 (6th Cir. 2010) (quoting Walker v. Engle, 703 F.2d 959, 962 (6th Cir. 1983)).

Trial court errors in state procedure or evidentiary law do not rise to the level of federal constitutional claims unless the error rendered the proceeding "so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." McAdoo v. Elo, 365 F.3d 487, 494 (6th Cir. 2004) (citing Estelle v. McGuire, 502 U.S. at 69-70). In other words, the Court "cannot grant the writ based on [its] disagreement with 'state-court determinations on state-law questions,' unless the state-court determination is so 'fundamentally unfair' that it deprives a defendant of due process." Wynne v. Renico, 606 F.3d 867, 871 (6th Cir. 2010) (internal and end citations omitted).

### 2. Application

The photograph in question here depicted the deceased victim's body as she was found on November 18, 2005. Prior to the photograph being admitted, the victim's uncle had testified that, when he and his mother discovered the body, the victim was lying on the ground by a dumpster. The victim was wearing only socks and a sweater that was pulled up to her shoulders, exposing her breasts. The uncle claimed that the body was frozen and that the eyes were rolled. (Tr. Aug. 23,

2006, at 38-9.) The medical examiner gave similar testimony after the photograph was admitted in evidence. (Tr. Aug. 24, 2006, at 63-65.)

Defense counsel objected to the admission of the photograph on the ground that there had already been testimony regarding how the body was found and that the photograph was more prejudicial than probative. The trial court allowed the picture to be admitted after determining that it was neither prejudicial nor inflammatory. (Tr. Aug. 23, 2006, at 96-97.)

The photograph apparently was not gruesome and, even if it were, a claim that a gruesome photograph of the decedent was erroneously admitted in evidence fails to state a constitutional claim and is not cognizable on habeas review. Cooey v. Coyle, 289 F.3d 882, 893-94 (6th Cir. 2002) (citing Gerlaugh v. Stewart, 129 F.3d 1027, 1032 (9th Cir. 1997)). Even assuming that Petitioner's claim were cognizable, the Sixth Circuit held in Biros v. Bagley, 422 F.3d 379, 391 (6th Cir. 2005), that it was not fundamentally unfair to admit photographs depicting the victim's severed head, severed breast, and torso where there was a cautionary jury instruction and the evidence was admitted to rebut the defense theory.

> While the photograph in this case may have been redundant and somewhat prejudicial, it
>
> was relevant to corroborate and demonstrate the medical examiner's testimony regarding the victim's appearance. The marks on her body, the state of her clothes, and how dry or damp her head and hair were, gave the jurors relevant information about what happened, and whether defendant's statement was credible.

People v. Gilbert, Mich. Ct. App. No. 273644, at 2.

The Court concludes that admission of the photograph did not rise to the level of fundamental unfairness. Consequently, Petitioner is not entitled to habeas corpus relief on the basis of his evidentiary claim.

### C.  Denial of Petitioner's Motion for a Mistrial

13

In his third and final claim, Petitioner alleges that the trial court erred and deprived him of a fair trial when the court denied his motion for a mistrial. The basis for the motion was the collapse and emotional breakdown of the deceased victim's mother during trial. Petitioner contends that the incident created sympathy for the victim's family. The Michigan Court of Appeals, however, concluded that the trial court did not err when it denied the request for a mistrial.

The question on habeas corpus review is not whether the trial court abused its discretion or should have declared a mistrial, but whether the state appellate court's determination that the trial court did not abuse its discretion was an unreasonable application of clearly established Federal law. Renico v. Lett, 130 S. Ct. 1855, 1862 (2010). Review of a state court's denial of a motion for mistrial requires application of a high standard. Johnson v. Mitchell, 585 F.3d 923, 937 (6th Cir. 2009) (citing Zuern v. Tate, 336 F.3d 478, 485 (6th Cir. 2003)). Reversal is not warranted unless the underlying conduct or incident

> "was potentially so misleading and prejudicial that it deprived [the defendant] of a constitutionally fair trial." Donnelly v. DeChristoforo, 416 U.S. 637, 641–42 (1974) (noting that "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice' "). Specifically, habeas review of this state decision involves "the narrow [review] of due process, and not the broad exercise of supervisory power that [a federal appellate court] would possess in regard to (its) own trial court." Id.

Zuern v. Tate, 336 F.3d at 485 (alterations in original).

The record indicates that a recess was abruptly taken during Police Officer William Koenig's testimony. After the recess, and in the jury's absence, defense counsel moved for a mistrial on the ground that the mother of the deceased victim had an emotional reaction in the courtroom. Defense counsel argued that the display of emotion likely prejudiced the jurors to the extent that they would be unable to overcome their sympathy for the mother and incapable of considering the fine

14

distinction between felony murder and second-degree murder.

The prosecutor opposed the motion and pointed out that the victim's mother had been sitting in the back of the courtroom and collapsed as she tried to exit the courtroom. The prosecutor stated that the jury left the courtroom within two or three minutes of the incident.

The trial court explained that the woman had collapsed in the back of the courtroom, that medical attention had been necessary, and that the woman was escorted to a local hospital. The trial court stated that it did not know who had collapsed and that it was not sure the jury knew who had collapsed, but that the incident did not give rise to a mistrial. At defense counsel's request, the trial court read the following cautionary instruction to the jurors immediately after they returned to the courtroom:

> Folks, I need to read you this instruction. Remember that you've taken an oath to return a true and just verdict based only on the evidence and my instruction on the law. With reference to the incident that occurred prior to our lunch break, you must not let sympathy or prejudice influence your decision.

(Tr. Aug. 23, 2006, at 80-81.) At the conclusion of the case, the trial court also instructed the jurors not to let sympathy or prejudice influence their decision, and the court charged the jurors to consider only the properly admitted evidence. (Tr. Aug. 25, 2006, at 33, 35-36.)

Even if the jurors recognized the distraught woman as the victim's mother and saw her collapse, the prosecutor stated that the mother clearly was upset earlier in the trial when she took the stand and testified. The jury could have concluded that woman's distress was a natural reaction to testimony about her daughter's death. Given the cautionary instructions and the fact that "juries are presumed to follow their instructions," Richardson v. Marsh, 481 U.S. 200, 211 (1987), the emotional outburst was not so prejudicial as to deprive Petitioner of a fair trial. The Court therefore denies relief on the basis of Petitioner's claim about the emotional outburst during trial.

15

## V. CONCLUSION

The state appellate court's opinion affirming Petitioner's conviction and rejecting his claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable application of the facts. Accordingly, the petition for writ of habeas corpus is denied.

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Reasonable jurists would not find the Court's assessment of Petitioner's claims debatable or wrong, nor conclude that the issues deserve encouragement to proceed further. Accordingly, the Court declines to issue a certificate of appealability. However, the Court will grant Petitioner leave to appeal in forma pauperis.

SO ORDERED.


Dated: January 23, 2012    s/Mark A. Goldsmith
       Flint, Michigan    MARK A. GOLDSMITH
                          United States District Judge

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 23, 2012.

                                                s/Deborah J. Goltz
                                                DEBORAH J. GOLTZ
                                                Case Manager